## CORNELIUS D. KENNY *vs.* MARTIN GILLET & CO.

*Trade-Marks—Injunction to Restrain their Simulation—Use of Terms calculated to Deceive—When Equity will not interfere.*

Where a firm use a trade-mark accompanied with statements in their label plainly calculated to deceive and mislead purchasers, they cannot rightfully claim equitable interference to prevent the use by others of bags, devices, and labels alleged to be fraudulent simulations of the trade-mark, bags and labels used by such firm.

Courts of equity never interfere in cases of this kind, by way of injunction, where there is clear misrepresentation by the plaintiff in his trade-mark and labels.

It is not necessary that the plaintiffs should have deliberately designed to deceive. If what they have said in their label is naturally calculated to deceive, and must and does inevitably deceive, the falsehood which their label conveys must bring to them the same consequences as if wilfully uttered.

APPEAL from the Circuit Court of Baltimore City.

The case is stated in the opinion of the Court.

Kenny *vs.* Gillet.

The cause was argued before ALVEY, C. J., MILLER, ROBINSON, IRVING, BRYAN, and STONE, J.

*William A. Taaffe* and *Charles Marshall*, for the appellant.

*Richard S. Culbreth*, and *S. Teackle Wallis*, for the appellees.

IRVING, J., delivered the opinion of the Court.

The appellees, Martin Gillet & Co., tea dealers, in Baltimore City, obtained a decree for injunction in the Circuit Court of Baltimore City, restraining the appellant, Cornelius D. Kenny, from using certain cylindrical bags containing tea for sale, with certain labels, with devices upon them, which tea was called "Hi-Hi," because the Court held appellant's bags, devices and labels to be fraudulent simulations of the appellee's trade-mark, bags and labels, for the sale of their "He-No" tea. From that decree this is an appeal.

The conclusion we have reached renders it unnecessary for us to decide whether appellant has simulated the appellees' trade-mark ; for we are clearly of opinion that though he may have done so, as the Circuit Court of Baltimore decided he had done, but about which we express no opinion, still the appellees are not entitled to the relief asked for, because their trade-mark is accompanied with statements in their label so plainly calculated to deceive and mislead purchasers, that they cannot rightfully claim equitable interference. The statements made upon the label may, possibly, not have been designed to be false and fraudulent, yet the language employed cannot be construed otherwise than as asserting, concerning the tea exposed for sale, that which is, in fact, deceptive and misleading. Courts of equity never interfere in cases of this

kind, by way of injunction, where there is clear misrepresentation by the plaintiff in his trade-mark and labels. This Court has several times so decided in most unequivocal terms.

Careful inspection and examination of the appellees' trade-mark and label leave no doubt upon our minds that any one who is not informed of the true state of facts would be deceived thereby. The tea is put up in cylindrical packages, twisted at the top, and tied securely with a small string. Three concentric blue circles surround the twisted part as a common centre. At the top and bottom of the bag or package Chinese characters encircle the bag which, translated into English, mean "Martin Gillet & Co's genuine 'He-No' tea." Upon the front of the package appears the following inscription, viz., "Standard He-No." "Trademark registered 1875." Martin Gillet & Company, importers, guarantee this tea pure and free from all adulteration. On the reverse part of the package is printed this statement: "Kind the Chinese drink." On a blue band passing around the bag from top to bottom, is this further representation: "The importers of He-No Tea are Martin Gillet & Co., a house established in 1811 by Martin Gillet. The present members of the firm are his descendants in the third generation. He-No Tea is the successful result of their experience;" and on this band is the further statement: "*This band of any color is our trade-mark.*"

From these statements the casual reader of them would certainly understand that there was a kind of tea in China called "He-No" tea, and that this tea was the kind the Chinese drank; and that this very tea the appellees imported direct from China, and was by them guaranteed to be the pure and genuine article. We were so impressed, and believed until we knew the contrary; and we do not think the most scrutinizing

reader would ever imagine it to be a tea compounded of several varieties in the City of Baltimore, as the evidence clearly and undeniably shows it to be prepared in the house of the appellees; and that it was not imported, as sold, from China.

The Circuit Court decided that the representations were not necessarily fraudulent and harmfully misleading; and therefore granted the relief asked for. That Court thought, that because the component parts of the preparation came from China, and were purified by the appellees' secret process, and was sold as pure tea, no matter if there was no variety in China known as He-No, (as there is not) the representation was only that it was a pure tea such as the Chinese drink; that is, unadulterated, as contra-distinguished from ordinary tea which is adulterated before exportation from China, and which the Chinese do not drink.

It is not necessary that the appellees should have deliberately designed to deceive, (and in this case they may not have so intended;) yet if what they have said in their label is naturally calculated to deceive, and must and does inevitably deceive; then the falsehood which their label conveys must bring to them the same consequences as if wilfully uttered. Knowing the facts, the inscriptions may be understood truthfully, perhaps, but ignorant of them, we cannot think any one would understand from what is said on the packages, that the tea they contain was other than a particular kind of tea grown in China and drunk by the Chinese people. No one certainly would suspect that it was a tea compounded in Baltimore of three different brands of tea; and if it *were guessed* to be a mixture, still it would be thought to be brought in that form from China. Indeed the statement, that it is the kind the Chinese drink, of necessity implies, that the particular article thus described was the drink of the Chinese, and most

generally used by them.  Again, by calling it "Standard He-No" tea there is a plain implication that there are various grades of it, and that this is the "Standard" or best article of the kind.  The guaranty endorsed implies that it is "Standard;" and purchasers without doubt are misled into buying an article different from what they expected to get, and suppose, in error, that they have gotten.  The encasing the tea in tin foil, or the lining the bags therewith, is well calculated to aid the impression conveyed by the labels, that it is directly brought from China in those bags; as all imported teas are brought in boxes lined with tin foil, the better, we suppose, to protect on the sea voyage. The attempted explanation of what is intended by the expressions employed upon the labels and in the guaranty, and accepted by the Court below, does not, in our view, relieve them from their deceptive and misleading character, and certain effect, which works a fraud; security against which is intended to be provided by the rule of non-intervention by Courts in such case.

We cannot doubt in this case, from the proof, that the appellees, by some method, which is their secret, so cleanse the teas composing this mixture of most objectionable impurities, so as to sell a good article; but this cannot excuse the deceptive statements they make in their labels, nor relieve them from the consequences of the natural and necessary import of the language employed in their labels.

This case is very similar to that of *Pidding vs. How*, 8 *Simons*, 477, where the representations of the plaintiff respecting his tea on the market were held to be so deceptive as to deprive him of the right to injunction. To us it seems to be nearly, if not quite, as strong a case for the application of the rule that equity will not interfere, as the cigar case of *Palmer vs. Harris*, 60 *Pa.*,

Kenny *vs.* Gillet.

156, or *Hobbs vs. Français*, 19 *How. Pr.*, 567. The last mentioned case was one where a powder for beautifying and preserving the complexion was called "Meen Fun," and the label was calculated to induce the belief that it was manufactured in London, and had received the patronage of "Her majesty the Queen." It is certainly quite as strong a case as *Manhattan Medicine Co. vs. Wood*, 108 *U. S.*, 218, which this Court followed in *Siegert vs. Abbott*, 61 *Md.*, 284, and there cited various other cases in support of the decision then made, and from which we do not incline to depart. It follows from all we have said that the decree must be reversed, and the bill be dismissed.

*Decree reversed, and*
*bill dismissed.*

(Decided 3d May, 1889.)


BRYAN, J., filed the following dissenting opinion:

Martin Gillet & Co. filed a bill in equity against Kenny. The complainants alleged that they were engaged in the business of buying and selling teas; and that in the year eighteen hundred and seventy-five they placed on the market a tea of superior quality which they called "He-No;" that this word was the invention of the complainants, and that they had acquired the right to the exclusive use of it, and had registered it as a trade-mark in the office of the Commissioner of Patents; and that the tea prepared and sold by them under this name acquired a high degree of public favor, and became known throughout the United States as their preparation; and that the packages, marks, symbols and other indicia used in connexion with the name of "He-No," became well known within the same limits, and served to identify the tea, and to distinguish it from tea prepared by other persons. It was

further alleged that Kenny, the respondent, for the purpose of appropriating to his own benefit the fruits of the enterprize of the complainants, had prepared a tea closely resembling theirs, and had also simulated and imitated their trade-mark and their signs, devices and symbols, and by the use of these simulations and imitations had caused customers and dealers to believe that his tea was, in fact, the He-No tea prepared by the complainants. The bill prayed for an injunction and an account. A preliminary injunction was granted, which on final hearing was made perpetual and an account decreed.

He-No tea is put up in cylindrical paper packages of different sizes; containing respectively a pound, half a pound, and a quarter of a pound. These packages have at the top and bottom Chinese letters or characters; and on the front have these words printed in blue: "Standard He-No Tea, Trade-Mark, reg'std 1878—Martin Gillet & Co., importers, guarantee this tea pure and free from all adulteration." The packages of Kenny are of the same size, have different Chinese letters at the top and bottom, and in front bear these words of a deeper blue than Gillet's: "Standard Hi-Hi Tea, Trade Mark applied for. C. D. Kenny, the packer, guarantees this tea free from all adulteration." On the reverse side Gillet's package has a Chinese junk, and under it the words, "Kind the Chinese drink." Kenny's has a mandarin holding a flag; on the flag is the word "Hi-Hi." Two bands of blue color run lengthwise on the Gillet package, separating the front from the reverse side. On one of these in white letters there are certain directions for preparing the tea for the use of the table. On the other of these bands, these words are printed also in white letters, "The importers of He-No tea are Martin Gillet & Co. A house established in 1811 by Martin Gillet. The present mem-

bers of the firm are his descendants in the third gene-
ration. He-No tea is the successful result of their ex-
perience." On Kenny's package the two sides are
separated by spaces, and in each of these spaces the
word "Hi-Hi" is printed three times at equal intervals.
The distribution of the words, and the arrangement of
the spaces between them are extremely similar on both
the packages. If any one should place these packages,
side by side, and examine them with even slight care,
he could not fail to observe the differences between
them. His attention would probably be more distinctly
attractid to the points of difference, than to the resem-
blances. But if Kenny's package was intended as a
counterfeit of the other; as a means of deceiving the
public who purchased tea, and deluding them into the
belief that it was the same as Gillet's; the two pack-
ages would not be .exhibited together, nor would a
comparison of the two be invited. As the packages
stood on the shelves, the front sides would be exposed
to the purchaser, and we think that the general resem-
blance between these sides is very great. This resem-
blance cannot be adequately shown by a description,
but the packages have been exhibited to us for our in-
spection, and I am satisfied that in the ordinary course
of retail trade, one might readily be imposed on a pur-
chaser for the other. Tea is consumed by persons of
all classes and conditions; but small purchases are
made in a vast number of instances by persons of small
means and limited intelligence, and frequently by young
children and by menial servants. It is not to be sup-
posed that, in buying a quarter of a pound of tea,
minute observation and great care and circumspection
would usually be practiced. And yet it is on occasions
of this kind, that the greatest injury would be done to a
dealer whose trade-mark was infringed. A person hav-
ing seen Gillet's package once or twice, or a few times,

and noticing only the general appearance, might, on a future occasion, exercising the care usually bestowed on the expenditure of two or three dimes, readily suppose Kenny's to be the same article. The intelligent, experienced and careful dealer is not easily deceived in the wares which he lays in for the purposes of his trade; but the vast multitude of consumers have not his intelligence, skill or habits of observation. It is by deceiving these, and securing their custom, that frauds on the owner of a trade-mark are successfully perpetrated. I am well satisfied from the evidence that the trade-mark, packages and devices of Gillet & Co. were intentionally and deliberately imitated by Kenny, for the purpose of unjustly diverting their trade to his benefit.

The statement on the complainants' packages clearly sets forth that "He-No" is a trade-mark. If this word described any of the qualities or characteristics of the tea, or its species, or place of production, it would not be a valid trade-mark. It is a perfectly arbitrary and meaningless word, a mere symbol used by the proprietor for the purpose of identifying the merchandise which he offers for sale. Any device, or emblem, or figure would have answered the same purpose, provided it did not indicate the generic name of the subject, or describe some quality of it. The proprietors for instance might have adopted a *fac-simile* of an ancient work of art; or they might have called the article "Astrological Tea," or "Patriotic Tea," or have given it any other name which fancy or caprice suggested. The simple statement that the word "He-No" was a trade-mark, was a distinct and unequivocal declaration to the public that the complainants had invented this name; and for their own purposes, and to suit their own wishes, had bestowed it on the merchandise which they offered for sale in these packages.

Kenny *vs.* Gillet.

It was also a declaration that it did not describe any genus or species of tea, or denote any place of production, or growth, or preparation. The package also bears the statement that "the importers of He-No tea are Martin Gillet & Co.;" and after reciting the establishment of the house in 1811, it is further said: "He-No is the successful result of their experience." The complainants had made various experiments in compounding teas; and it appears that they finally obtained an acceptable flavor by mixing together the teas known as "Foo Chow Oolong," "Formosa Oolong" and "Young Hyson." The announcement on their packages fairly and sufficiently gives the information, that the knowledge and experience acquired in the course of their business had enabled them to prepare with success the combination which they offered for sale under this fanciful name. In his answer to the thirteenth interrogatory the witness Owen A. Gill testifies as follows: "By the term 'Kind the Chinese drink' we mean such teas as the Chinese use, in contradistinction to those which are specially prepared for foreign markets by various manipulations to give them what is termed by the trade 'Style,' teas that are rolled up into conventional forms, such for instance as the sample which I now hold in my hand, and which grains seem to be perfect, and a tea which is round and beautiful to look at; such teas the Chinamen do not drink, and it was to supplant those that we have attempted to introduce the tea called 'He-No' and which is the kind the Chinese drink." In his answer to the fifteenth cross-interrogatory he says: "He-No tea is mixed by us in Baltimore under our own supervision. We import a portion of the ingredient. We do not import the tea in packages, but as we have represented and say we pack them ourselves." And in his answer to the seventeenth cross-interrogatory he says: "When

I said we import a portion of tea, I was talking about importing from the place of growth; everything that the package of He-No contains is the purest and best that our knowledge and experience permit us to get, every grain of tea, and it is all tea in the package, is imported from the place of growth, and if I were present at the place of growth to select the teas they would not be different from what they are." There is no evidence to contradict this testimony. The witness most evidently means that teas intended for foreign markets are subjected to various manipulations, and that the Chinese do not drink these manipulated teas, and that the mixture called "He-No Tea" is made entirely of the unmanipulated teas which the Chinese drink. And the words on the package "Kind the Chinese drink," are in perfect harmony with the facts in evidence. The complainants are importers of tea, and import every one of the teas which enter as ingredients into the composition of He-No. The general accuracy of their statement in this respect is not impaired by the fact, that when the exigencies of the business required it, they also purchased the invoices of other importers.

Taking everything which appears on these packages, and considering it as the expression of one harmonious meaning, and regarding it, as it was presented to the minds of the proprietors of this article, we may paraphrase it as follows: "He-No is a meaningless word, by which we designate a mixture of different descriptions of tea; these teas which we have compounded are not the manipulated kind which are prepared in China for foreign markets, but they are pure and unmanipulated, such as the Chinese themselves drink and we import them ourselves." It would be easy to assign a different meaning to the words used on the packages, if we excluded from consideration the grand

Kenny *vs.* Gillet.

controlling facts, that the word "He-No" is declared to be a trade-mark not descriptive of any species of tea; and that "He-No" tea is declared to be the successfull result of the experience of the proprietors. But bearing these two matters in mind, it is impossible to interpret the statements in question as meaning that there is a species of tea produced in China, known as He-No, and that the Chinese drink it. These complainants by their industry, intelligence, and attention to business have built up a very profitable trade, and appear to have acquired in a large measure the confidence of the mercantile community. One of the fruits of their enterprise has been the preparation of a mixture of teas, which has met with large and profitable sales. A rival dealer has simulated the trademark, and packages, symbols, and devices by which their merchandise was known, and has endeavored to divert to his own benefit, by these fraudulent means, the profits which they were most justly entitled to reap from the reputation and merits of an article, which was the result of their own skill and experience. And to escape from responsibility for his misconduct, he charges them with attempting to deceive and defraud the public by false statements made in reference to this article. A charge of this kind may be lightly made; but it ought not to be sustained against long established character without strong and convincing proofs. In this instance, it is exclusively founded on an exposition of words and phrases, severely critical, and very remote from the meaning of the persons who used them. According to this meaning which is expressed with reasonable certainty, the statements made by the complainants are strictly true.

The decree of the Circuit Court was in accordance with the views which I have expressed, and I think it ought to be affirmed.

(Filed 3rd May, 1889.)