MASCARO *v.* SNELLING AND SNELLING OF
BALTIMORE, INC.

[No. 207, September Term, 1967.]

216

*Decided May 31, 1968.*

*Motion for rehearing filed June 26, 1968; denied June 28, 1968.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES and SINGLEY, JJ.

*William R. Dorsey, III,* with whom were *Ambler H. Moss* and *Semmes, Bowen & Semmes* on the brief, for appellant.

*Benjamin Lipsitz,* with whom were *Hyman K. Cohen* and *Eleanor J. Lipsitz* on the brief, for appellee.

SINGLEY, J., delivered the majority opinion of the Court. BARNES, J., dissents. Dissenting opinion at page 236, *infra.*

This case comes to us on an appeal and cross appeal from a decree of the Circuit Court of Baltimore City entered in an equity proceeding brought to resolve a dispute which had arisen between two licensees of a national employment agency.

At the trial before the chancellor, the testimony was extensive and voluminous exhibits were introduced. We have no quarrel with the chancellor's findings of facts, which are carefully set out in his opinion. Maryland Rule 886 a; *Wood v. Wood,* 227 Md. 211, 176 A. 2d 229 (1961); *Parker v. Parker,* 222 Md. 69, 158 A. 2d 607 (1960); *Moran v. Moran,* 219 Md. 399, 149 A. 2d 399 (1959). We are not, however, bound by his conclusions of law. *Pallace v. Inter City Land Co.,* 239 Md. 549, 212 A. 2d 262 (1965); *Space Aero Products Co. v. R. E. Darling Co.,* 238 Md. 93, 208 A. 2d 74 (1965).

Snelling and Snelling, Inc. is a Pennsylvania corporation, which had its principal office in Philadelphia and later in Radnor, Pennsylvania. Although not a party to the case, it will be referred to in this opinion as "Philadelphia Snelling." Its operations have two aspects: In Philadelphia, commencing as a partnership in 1950, and later as a corporation, it has operated an employment agency. The other phase of Philadelphia Snelling's activity commenced in 1955 and involves the licensing of franchisees, under which individuals or corporations are permitted to operate similar employment agencies in various sections of the country under the trade name "Snelling and Snelling," using the techniques, office procedures, business forms, trade name, and after 1961 the trade mark "Fort Snelling." [1]

---

1. Philadelphia Snelling's registration of the service mark "Snelling and Snelling" and of the trade mark "Fort Snelling" with the U. S. Patent Office became effective on 20 June 1961 and 23 May 1961, respectively. Since this was subsequent to the agreement with the appellee it was conceded that state law was controlling in this case.

The consideration for such a license usually consists of an initial lump sum payment by the franchisee, plus a 7% commission or override on the gross monthly billings of the franchisee, of which 2% was originally allocated to the cost of a program of national advertising contracted for by Philadelphia Snelling. While the agreements under which franchisees have been licensed have varied, all of them contain stringent provisions restricting assignment, controlling the operation of the franchise, and insuring uniformity in stationery, forms and advertising.

On 5 September 1956, Philadelphia Snelling entered into a licensing agreement with Lionel Jacobs and James A. Mac-Dougal, who paid $12,000 for a franchise which gave them "the exclusive right to use the name 'Snelling & Snelling' " in a territory:

> "Comprised of Baltimore, Maryland, and the surrounding counties * * * limited to the following Counties * * *: Queen Anne, Harford, Baltimore, Carroll, Howard, Anne Arundel, and Kent; it being expressly understood between the parties that the right to solicit applicants within said territory shall not be granted to any other Licensee."

The Jacobs-MacDougal effort proved unsuccessful, and the agreement was ultimately revoked by Philadelphia Snelling.

On 5 July 1960, Philadelphia Snelling entered into a licensing agreement with Snelling and Snelling of Baltimore, Inc., a Maryland corporation (Baltimore Snelling) of which Maynard Z. Drossner was president, treasurer and principal owner. Drossner had considered other franchises, including one in Atlantic City, and possibly another in Norristown, Pennsylvania (this testimony is disputed, however); knew that Philadelphia Snelling had licensed independent franchisees in the environs of Philadelphia; was aware of the failure of the Jacobs-MacDougal franchise; and knew also that their territory had included not only Baltimore City, but the surrounding counties.

The agreement with Baltimore Snelling contained two provisions which are particularly significant:

"1.(a) Snelling [Philadelphia Snelling] hereby grants to licensee [Baltimore Snelling] *the exclusive right to use the name* Snelling and Snelling and/or Snelling and Snelling of Baltimore, Inc. *in connection with one office only to be opened by licensee in Baltimore, Maryland.* Licensee shall not directly or indirectly establish an office or place of business, or move to any locations outside of such territory; nor shall licensee change its name without first obtaining the written consent of Snelling; nor shall licensee establish any branch or additional office without the written consent of Snelling. (Emphasis added.)

\* \* \*

"9. \* \* \* Licensee and shareholders [Baltimore Snelling] agree, when requested by Snelling [Philadelphia Snelling], to waive any and all objections licensee may legally have against the use of the name 'Snelling and Snelling' in territories other than the territory granted to licensee herein."

Baltimore Snelling commenced operations in August, 1960, and was immediately successful. In 1962, Drossner wished to expand his business to include Towson, the county seat of Baltimore County, which is beyond the corporate limits of Baltimore City. When Drossner failed to reach agreement with Philadelphia Snelling on the amount of the franchise fee, he began to press the contention that Towson was a part of the metropolitan area within the contemplation of the parties when the licensing agreement of 5 July 1960 was signed, granting to Baltimore Snelling a franchise for Baltimore, Maryland. Philadelphia Snelling resisted this, relying on a literal interpretation of the agreement: *i.e.,* that Baltimore, Maryland, meant the corporate limits of Baltimore City.

Although the agreement with Baltimore Snelling limited it to one office in Baltimore, in 1963 Drossner wanted to open a second office in the heavily industralized area of Highlandtown, which lies within the city's eastern boundary.

In 1963, Drossner and his wife formed a Maryland corporation, Snelling and Snelling of Highlandtown, Inc. (Highland-

town Snelling) and on 20 December 1963, Highlandtown Snelling entered into a licensing agreement with Philadelphia Snelling. While structured similarly to the agreement of 5 July 1960, which had been entered into with Baltimore Snelling, the contract was patently more sophisticated, and probably reflected Philadelphia Snelling's experience in the franchise field. Two provisions are of particular importance. Paragraph 1(a) omits the word "exclusive" and precisely limits the territory subject to the franchise:

> "1. (a) [PHILADELPHIA] SNELLING hereby grants to Licensee [Highlandtown Snelling] the right to use the registered tradename "Snelling and Snelling", the Fort Snelling registered trademark,[2] and to be identified as a member of the Snelling and Snelling System in connection with the operation of a personnel consulting and employment agency business (herein sometimes called 'Licensee's business') to be conducted at an office located within the *following area: Bounded on the North by Pulaski Highway; on the East by Kresson Street; on the South by Eastern Avenue and on the West by Broadway. All located within the city of Baltimore.*" (Emphasis added.)

For that portion of Paragraph 9 of Baltimore Snelling's agreement (which required Baltimore Snelling to waive any objections which it might legally have to the use of the Snelling name in other territories) Paragraph 1(c) was substituted in Highlandtown Snelling's agreement:

> "1. (c) In connection with the operation of Licensee's business, Licensee shall use only the name 'Snelling and Snelling' and Licensee shall identify itself as a member of the Snelling and Snelling System, unless state law requires other or additional identification. SNELLING shall not grant to any other person, firm or corporation the right to use the name 'Snelling and Snelling' in connection with the operation of a personnel consulting and employment agency

---

2. See footnote 1, *supra.*

office within the area described in paragraph 1 (a) hereof; *provided, however, that in the event SNELLING shall open offices or grant such right to others outside the described area but within the State where Licensee's office is located, Licensee does hereby release and waive any objection to the use of the name 'Snelling and Snelling' in connection therewith."* (Emphasis added.)

Drossner paid no franchise fee for Highlandtown. Robert O. Snelling, president of Philadelphia Snelling, testified that it was not his company's policy to exact a franchise fee for the opening of a second office in a territory already franchised, but because of Highlandtown's close proximity to the Essex-Dundalk industrial complex, he believed that there was a possibility that the value of a Dundalk-Essex franchise might be prejudiced by the close proximity of another office. Consequently, Baltimore Snelling was required to amend its 1960 agreement, with the result that a 7% override with no allocation for national advertising was substituted for the earlier override of 5% and a 2% contribution to Philadelphia Snelling's national advertising budget.

On 28 January 1964, Drossner and Stanley Sackett entered into an agreement with Philadelphia Snelling for the licensing of an office in Towson. The franchise fee was $3,000; the agreement, substantially similar to Highlandtown Snelling's, except that the territory was described as "the city of Towson, Maryland, as of this date"; and on 16 March 1964, the agreement was assigned, with Philadelphia Snelling's consent, to Snelling and Snelling of Towson, Inc. (Towson Snelling). On 14 June 1965, Philadelphia Snelling again entered into a substantially similar agreement [3] with Snelling and Snelling of Glen Burnie, Inc. (Glen Burnie Snelling). A franchise fee of $2,600 was paid for a territory described as "the city limits of Glen Burnie, Maryland as of this date."

It is interesting to note that the ownership of the several franchises was not identical: Baltimore was owned by Drossner

---

**3.** This agreement provided for minimum annual overrides, however.

and his wife (50%) and Bert H. Cohen and his wife (50%); Highlandtown, entirely by Drossner and his wife; Towson, by Drossner (50%) and Sackett (50%); and Glen Burnie, by Drossner and his wife (50%) and Robert L. Cobaugh (50%). Because Snelling and Snelling appears in each of the corporate titles, Baltimore Snelling's consent was required in order for Highlandtown, Towson and Glen Burnie to be incorporated, as contemplated by Paragraph 9 of the agreement of 5 July 1960, and was given to the State Department of Assessments and Taxation.

On 4 November 1965, Angelo R. Mascaro, the appellant here and one of the defendants below, entered into a licensing agreement with Philadelphia Snelling for a franchise in the Dundalk-Essex area of Baltimore County, for which he paid a franchise fee of $7,800. The territory was described in detail [4] and the franchise is hereafter referred to as "Dundalk-Essex Snelling." Except for the fact that the agreement was with an individual, it was substantially similar to Glen Burnie Snelling's, and included Paragraph 1(c).

Dundalk-Essex Snelling opened an office at 809 Eastern Boulevard in Baltimore County (and about 4 miles from Highlandtown Snelling) on 2 January 1966 and five days later Baltimore Snelling instituted suit.

The suit was brought in equity against Mascaro, the A. S. Abell Company (publishers of the Baltimore "Sun") and Chesapeake and Potomac Telephone Company,[5] on grounds of unfair competition. The bill of complaint alleged that Baltimore Snelling had since 17 August 1960, conducted business as an employment agency under the name "Snelling and Snelling" and had extensively advertised such name; that Drossner, the president, director and a stockholder in Baltimore Snelling was also an of-

---

4. "Outside of and East of Baltimore, In the State of Maryland, starting at the city limits of Baltimore East and South of Hwy. 40 to Hwy. 700 (Martin Blvd.), East and South of Hwy. 700 (Martin Blvd.) to Eastern Blvd. (Hwy. 150) South and East on Eastern Blvd. (Hwy. 150) to Wilson Blvd. (Hwy. 587) South and West of Wilson Blvd. (Hwy. 587) as per map attached."

5. It was ultimately dismissed as to the latter two defendants.

ficer, director and shareholder in Towson Snelling, Highland-town Snelling and Glen Burnie Snelling, also employment agencies trading under the same name with the consent of Baltimore Snelling. The bill further alleged that defendant, Angelo R. Mascaro had applied for an employment agency license indicating he would trade under the name "Snelling and Snelling" and had advertised under such name. The bill alleged that Mascaro sought to mislead the general public and take advantage of the good-will in the name "Snelling and Snelling" that Baltimore Snelling allegedly had established by advertising. Claiming that its trade name had been damaged and that Mascaro was unfairly competing, Baltimore Snelling sought a temporary and permanent injunction restraining Mascaro from using the name "Snelling and Snelling." The bill also sought injunctions against The Abell Company and the Telephone Company restraining them from accepting advertisements from Mascaro under the name "Snelling and Snelling." An ex parte injunction dated 7 January 1966 was issued restraining the defendants as prayed but granting leave to move for a hearing within two days. On 15 January 1966, another order was signed extending the injunction for a period of ten days on the petition of Baltimore Snelling alleging that no service had as yet been made on Angelo Mascaro.

On 17 January 1966, Mascaro moved to dissolve the ex parte injunction, alleging that he was a licensee of the parent organization, Philadelphia Snelling, the same corporation that had licensed Baltimore Snelling. Mascaro contended that under his contract he had been granted the right to the use of the name "Snelling and Snelling" in connection with an office to be opened in the territory in Baltimore County described in his agreement.

After a hearing on Mascaro's motion, an interlocutory order was entered on 2 February 1966, dissolving the ex parte injunction and granting Mascaro the right to the use of the name "Snelling and Snelling" in connection with his office but requiring him to add as a suffix to his advertising and material distributed to the public, the words "of Dundalk-Essex A. R. Mascaro" in the same type as the words "Snelling and Snell-

ing," and also the words "not connected with any other Snelling and Snelling office in this area."

Thereafter an answer was filed by Mascaro, and the case went to trial.

At trial Baltimore Snelling contended that through its prior use and advertising it had acquired the common law right to the exclusive use of the name "Snelling and Snelling" in the Baltimore metropolitan area. Mascaro contended that both he and Baltimore Snelling were licensees of Philadelphia Snelling, and that the parties' rights to the name were governed by their respective contracts with Philadelphia Snelling. By virtue of these contracts Mascaro said he had the right to open an office in the Dundalk-Essex territory as described in his contract and to use the name "Snelling and Snelling" in connection therewith and Baltimore Snelling's contract granted it the right to open an office in Baltimore, Maryland and use the name in connection therewith.

Baltimore Snelling replied, saying that its contract gave it the exclusive right to use the name in Baltimore City and Baltimore County.

In its opinion, the trial court found that Baltimore Snelling had no common law right to the use of the name Snelling and Snelling and that its right to use of the name derived from its license agreement with Philadelphia Snelling. It further found that the words "Baltimore, Maryland" in the contract between Baltimore Snelling and Philadelphia Snelling meant Baltimore City. However, the court went on to rule that by virtue of its contract, Baltimore Snelling had the exclusive right to the use of the name "Snelling and Snelling," in Baltimore City, and, therefore, while not denying defendant Mascaro the right to the use of the name "Snelling and Snelling" the court enjoined Mascaro from using the name unless he added a suffix to distinguish himself from Baltimore Snelling. Specifically, the court's decree enjoined Mascaro from using the name "Snelling and Snelling" in advertisements, materials distributed to the public, license applications and income tax returns

"unless he includes the identifying designation 'of Dundalk-Essex, A. R. Mascaro', or '(Dundalk-Essex)'

'A. R. Mascaro', immediately following said name (and, in the advertising and listing referred to in (a) and (b) above, in the same size type, print or lettering as said name if the use of said name is in typed, printed, written or other graphic form) and the explanatory words 'not connected with any other Snelling and Snelling office in this (or 'the Baltimore') area', or '(not connected with any other Snelling and Snelling office)' in a prominent place therein, except that said Angelo R. Mascaro, one of the defendants, be and he is hereby relieved of the necessity of including said identifying designation and explanatory words in connection with the use of said name 'Snelling and Snelling' (or 'Snelling & Snelling') on the door to the office of his said employment agency business."

It is from this decree that Mascaro appealed, on the ground that the injunction was unwarranted, and Baltimore Snelling appealed, arguing that the injunction should have been absolute, that Baltimore Snelling's rights to the use of the name extended beyond Baltimore City, and that the injunction should have issued against the A. S. Abell Company and the Telephone Company.

One of the operational manuals prepared by Philadelphia Snelling for the use of its franchisees, and admitted as an exhibit at the trial below, contains the statement "Snelling and Snelling now humorously regards itself as the Howard Johnson of the personnel field." Even if spoken in jest, this is the core of the controversy. In 1960, when Baltimore Snelling received its franchise, Philadelphia had licensed between 40 and 50 franchisees. At the time this case came to trial, there were approximately 280 licensees in the United States, Canada and Argentina. The basic philosophy of the multiple franchise operation, amply evidenced by the terms of the licensing agreements, the operational manuals, and the form of both national and local advertising, is the creation of a monolithic system in which individual franchisees exchange personal identity for total anonymity, and wrap themselves in the cloak of "Snelling and

Snelling, Inc.", "Pioneers in Personnel," "Offices Coast to Coast," "The World's Largest Personnel System." [6]

Baltimore Snelling's display advertisement in the classified telephone directory typified this idea. In large type, it began:

"SNELLING AND SNELLING

The Largest And Most Comprehensive Personnel System
In The Nation

BRANCH OFFICES—COAST TO COAST"

The advertisements which Baltimore Snelling inserted in the classified section of the Baltimore "Sun" followed the same format.

"SNELLING
AND
SNELLING

THE NATION'S LARGEST
PERSONNEL SYSTEM

200 offices coast to coast

Either office to serve you
Downtown

* * *

Towson

* * *

Glen Burnie

* * *

Highlandtown

[Then followed a list of job opportunities]

SNELLING & SNELLING"

---

6. Mascaro's statement, "We have five offices in the Baltimore area," made in a telephone conversation with Drossner's secretary, about which Baltimore Snelling complains, is entirely consistent with this concept.

Baltimore Snelling reads the provision of the license agreement of 5 July 1960, which grants

"the exclusive right to use the name Snelling and Snelling and/or Snelling and Snelling of Baltimore, Inc. in connection with one office only to be opened by Licensee in Baltimore, Maryland."

to mean that Dundalk-Essex Snelling is prohibited from listing its telephone in the Baltimore telephone directory (which contains listings for subscribers in Dundalk and Essex) ; from advertising in Baltimore newspapers or on Baltimore radio and television stations and perhaps from advertising in newspapers which circulate in Baltimore or Baltimore County or on radio or television stations heard there. In its cross appeal, Baltimore Snelling challenges the lower court's decree because it falls short of this goal and fails to enjoin the A. S. Abell Company and the Telephone Company from accepting such advertising.

In support of this contention Baltimore Snelling insists that "Snelling and Snelling" has acquired a secondary meaning in Baltimore, by dint of Baltimore Snelling's extensive program of newspaper, radio and television advertising, costing "well over $100,000."

The chancellor concluded, and we agree, that Baltimore Snelling's use of the name "Snelling and Snelling" is based on its rights under the agreement of 5 July 1960, and not on a common law right, since the name acquired no secondary meaning as a result of Baltimore Snelling's use of it; that by contract, Baltimore Snelling was given the exclusive right to use the name "Snelling and Snelling" in connection with its office in Baltimore, Maryland; and that Baltimore, Maryland, as used in the agreement, means the corporate limits of Baltimore City.

We agree, however, with the appellant's argument, that the grant of an "exclusive" right to use the name "Snelling and Snelling" *in connection with one office in Baltimore* is not an unrestricted right. Philadelphia Snelling retained a right, and could assign to others the right, to use the name in Baltimore in ways not connected with the Baltimore office. To hold otherwise would give rise to the conclusion that Baltimore Snelling might, if it wished, prevent Philadelphia Snelling from adver-

tising in national magazines which circulated in Baltimore. This was clearly not intended by anyone.

The agreement of 5 July 1960 between Philadelphia Snelling and Baltimore Snelling provided that it was to "be construed in accordance with the laws of the Commonwealth of Pennsylvania." Where contract language is plain and unambiguous, its meaning should be determined without reference to extrinsic facts or aids. *Sternbergh v. Brock,* 225 Pa. 279, 74 Atl. 166 (1909); *Kennedy v. Erkman,* 389 Pa. 651, 133 A. 2d 550 (1957). Words are to be given their ordinary meaning *Pines Plaza Bowling, Inc. v. Rossview, Inc.,* 394 Pa. 124, 145 A. 2d 672 (1958). However, if the language under consideration is ambiguous or uncertain a court must then determine the intention of the parties. In such a case a court may consider evidence of extrinsic factors: *i.e.,* negotiations of the parties, the circumstances surrounding execution of the contract, the parties' own construction of the contract and the conduct of the parties. *DeMoss v. Beryllium Corporation,* 358 Pa. 470, 58 A. 2d 70 (1948); *Sternbergh v. Brock, supra; Kennedy v. Erkman, supra.*

The lower court also found that the licensing of Dundalk-Essex Snelling by Philadelphia Snelling permitted the invasion by one licensee of another's territory and that this invasion and the resulting confusion mounted up to unfair competition, entitling Baltimore Snelling to equitable relief. We agree that an element of confusion was introduced by the licensing of Dundalk-Essex Snelling. We concede that Dundalk-Essex Snelling gained access to the communications media located in Baltimore; but we do not agree that this was the degree of confusion or the sort of invasion which warrants the granting of relief, as a matter of law.

There is ample authority for the proposition that a trade name may seldom be licensed or assigned, except as an incident to the sale of a business or of its good will. *Gault v. Wagner,* 227 Md. 521, 525, 177 A. 2d 691 (1962); Nims, *The Law of Unfair Competition and Trademarks,* 4th Ed. 1947, §§ 17, 22. The reason for the rule is that such transactions are likely to break the continuity of business reputations on which customers are likely to rely. *Emerson Electric Mfg. Co. v. Emerson Radio*

*& Phonograph Corp.*, 105 F. 2d 908, 909 (2d Cir.), *Cert. Denied,* 308 U. S. 616 (1939), and result in confusion and deception. Nims, *supra,* § 17, at 86. There is an exception, however. "A trade name, like a trademark, may be assigned, as long as it remains associated with the same product or business with which it has become associated in the public mind * * * And upon the same conditions it may be licensed or lent, and its exclusive use may be resumed by its owner according to the terms of the lending." *Cardinal v. Taylor,* 302 Mass. 220, 19 N. E. 2d 58, 59 (1939). For, as stated in *Corkran Hill & Co. v. A. H. Kuhlemann Co.,* 136 Md. 525, 533, 111 Atl. 471 (1920),

> "It may be enough that they [the articles] are manufactured for him, that he controls their production, or even that they pass through his hands in the course of trade, and that he gives to them the benefit of his reputation, or of his name and business style."

Or, as was said in *Gault v. Wagner,* 227 Md. 521, 526, 177 A. 2d 691 (1962) : "She [the licensor] is in a position to judge the quality of the work, and to exert a measure of control, through the right to terminate the license at will." *See also, Howard D. Johnson Co. v. Robbins Light, Inc.,* 328 Mass. 46, 101 N. E. 2d 348 (1951).

In a case involving a multiple-licensing arrangement similar to the one here involved, *Arthur Murray, Inc. v. Horst,* 110 F. Supp. 678, 679 (D. Mass. 1953), the court said:

> "In the light of the provisions of the agreement as set forth, it appears * * * that 'precautions were taken to insure that the Arthur Murray name would continue to indicate to the public what it had in the past, namely, a type of instruction conforming to the standards and methods of Arthur Murray'. It is plain we are not dealing here with a naked license."

*See also, E. I. du Pont de Nemours & Co. v. Celanese Corp.,* 167 F. 2d 484, 489, 35 C. C. P. A. (Pat.), 1061, 3 A. L. R. 2d 1213 (1948).

Having satisfied ourselves that the granting of the license was valid; that the licensor, having retained broad control, could fix

the conditions, delineate the territory, and recover its rights on breach or termination, *Howard D. Johnson Co. v. Robbins Light, Inc., supra,* we turn to a consideration of the element of unfair competition.

As Judge Delaplaine, speaking for this Court, said in *Edmondson Vil. Theatre, Inc. v. Einbinder,* 208 Md. 38, 43-44, 116 A. 2d 377 (1955) :

> "Like most doctrines of the common law, the law of unfair competition is an outgrowth of human experience. The rules relating to liability for harm caused by unfair trade practices developed from the established principles in the law of torts. These rules developed largely from the rule which imposes liability upon one who diverts custom from another to himself by fraudulent misrepresentation that the goods he is offering are the goods produced by the other. In England this type of fraud is commonly called 'passing off' or 'palming off' one's goods as those of another.
>
> "The American Law Institute made the following comment in 3 *Restatement, Torts,* ch. 35, pages 539, 540, on this constantly developing doctrine :
>
>> 'The law has not yet developed a complete generalized standard for measuring trade practices like the standard of reasonable care in negligence. In part this is due to differing standards of commercial morality in the various industries; in part it is due to the fact that this branch of the law developed eclectically from the law dealing with the older wrongs which were not directly related to trade practices and competition. But the tendency of the law, both legislative and common, has been in the direction of enforcing increasingly higher standards of fairness or commercial morality in trade.' "

A definitive discussion of recent developments in the field can be found in "Developments in the Law—Trade Marks and Unfair Competition" 68 Harv. L. Rev. 814 (1955).

*Parkway Baking Company v. Freihofer Baking Co.,* 255 F. 2d 641 (3d Cir. 1958) involved the question of competition be-

tween licensees in a multiple licensing arrangement. In that case, National Bakers Service, Inc., which owned a secret formula for baking low calorie bread and the trade mark "Hollywood," granted to Parkway an exclusive license to bake and sell Hollywood bread in a carefully defined area in Greater Philadelphia. Freihofer held the license for the territory, including the city of Allentown, immediately north of Parkway's. For a time, both Parkway and Freihofer sold to American Stores in their respective territories. American, desiring to deal with a single supplier, commenced to purchase its entire requirements from Parkway, which made deliveries to American's Philadelphia warehouse, although some of the bread was ultimately reshipped to American Stores in Freihofer's territory. Freihofer retaliated by making deliveries of Hollywood bread baked by him to a controlled distributor who took delivery of the bread in Allentown and redelivered to customers in Philadelphia. The court held that Parkway's sale to American in Philadelphia did not violate its license to bake and sell bread in Philadelphia, but that Freihofer's retaliatory sales, not being made in good faith, were a violation of its franchise. In so holding, the court construed the provisions of Parkway's license agreement in accordance with its literal terms [7] and concluded that there had been no invasion of Freihofer's territory.

The doctrine of confusion, relied on by the lower court in the case before us is of relatively recent development. Originally, unfair competition consisted of "passing off" or "palming off" one's goods as those of another through the practice of deception. As the law developed, proof of fraudulent deception was no longer essential for relief, and this is the Maryland rule. *Edmondson Vil. Theatre, Inc. v. Einbinder, supra,* and at the same time, the earlier cases, holding that lack of competition between the parties was a defense, were being overruled. *Compare Borden Ice Cream Co. v. Borden's Condensed Milk Co.,* 201 F. 510, 514, (7th Cir. 1912) *with Ward Baking Co. v. Potter-Wrightington,* 298 F. 398 (1st Cir. 1924).

---

7. While the court held that the contract was to be interpreted under the law of Illinois, it concluded that Pennsylvania law was the same.

In the course of this development, confusion came to be recognized as a ground for equitable relief, even in the absence of deception or direct competition. For the complaining party to obtain injunctive relief on grounds of confusion, in cases where a trade name is at issue, the existence of a secondary meaning must be established, *National Shoe Stores Co. v. National Shoes of New York, Inc.*, 213 Md. 328, 131 A. 2d 909 (1957) ; *Baltimore Bedding Corp. v. Moses,* 182 Md. 229, 34 A. 2d 338 (1943) ; Nims, *op. cit.,* § 334; Annot. 150 A. L. R. 1067. In the absence of a finding of secondary meaning, there must be proof of deception. *National Shoe Stores Co. v. National Shoes of New York, Inc., supra; Drive It Yourself Co. v. North,* 148 Md. 609, 614, 130 A. 57 (1925) ; *Afro-American Owls v. Talbot,* 123 Md. 465, 91 A. 570 (1914) ; Annot. 150 A. L. R. 1067. In the case before us, the court below found no evidence that the name "Snelling and Snelling" had acquired a secondary meaning in consequence of its use by Baltimore Snelling. With this we agree, since should we conclude that a secondary meaning had been developed, it follows that it had been developed by Philadelphia Snelling, and that Baltimore Snelling and Dundalk-Essex Snelling were derivative beneficiaries of the secondary meaning by virtue of their license agreements. While the lower court found that "destructive competition" and "confusion" existed, there was no direct finding of fraud or deception, nor would such a finding have been supported by the evidence.

A multiple franchise operation of the sort conducted by Philadelphia Snelling is a comparative newcomer to the business world. Philadelphia Snelling cites Howard Johnson as comparable, but others readily suggest themselves : Quality Courts, Holiday Inns, Arthur Murray Dance Studios, and Sunkist Oranges are typical.

Adopting the characterization contained in the opinion in *Quality Courts United, Inc. v. Quality Courts, Inc.,* 140 F. Supp. 341 (M. D. Pa. 1956), "Snelling and Snelling," like "Quality Courts" could be regarded as a collective trade name,[8] analogous to the collective marks [9] registerable under the Lan-

---

8. It was registered as a service mark in 1961.

9. These were unknown at common law. *Nims, supra,* § 22, at 130. *But cf. Keebler Weyl Baking Co. v. J. S. Ivins' Son, Inc.,* 7 F. Supp. 211 (E. D. Pa. 1934).

ham Act, 15 U.S.C.A. 1054, which are used in connection with the services of any person other than the owner to certify the quality and characteristics of the services. *See also, Huber Baking Company v. Stroehmann Bros.* Co., 252 F. 2d 945 (2d Cir.), *Cert. Denied,* 358 U. S. 829 (1958).

While the contractual arrangements and legal relationships between the multiple licensees may vary, all multiple franchise operations have one element in common—the complete subordination of the identity of the individual owner or operator to the group image. The "confusion" of which Baltimore Snelling complains is not only a natural result, but may even be a desired product of the structure, and must be sharply differentiated from the situations considered by this Court in *A. Weiskittel & Son Co. v. Harry C. Weiskittel Co.,* 167 Md. 306, 173 A. 48 (1934) and *Neubert v. Neubert,* 163 Md. 172, 161 A. 16 (1932). No better example of the monolithic facade of the Snelling "system" can be found than in Drossner's own operation. His advertising would leave the uninformed to believe that Baltimore, Highlandtown, Towson and Glen Burnie are integral parts of a nation-wide system, which they are, for there is nowhere in the advertising an intimation that each of the four offices is a separately organized and owned business entity.

In recent times, the doctrine of unclean hands which Dundalk-Essex Snelling asserted in its answer has been regarded as a doctrine applied for the protection of the court and not of the parties, *Space Aero Products Co. v. R. E. Darling Co., supra,* 238 Md. at 120, and is seldom a defense available in an unfair competition action. Chafee, "Coming Into Equity With Clean Hands," 47 Michigan L. Rev. 1065, 1076-1080 (1949). The case which denied relief to the manufacturer of "Balm of Thousand Flowers" soap, which contained no flowers; [10] to the formulater of "California Fig Syrup," which contained no figs; [11] and the problem faced by this Court in the He-No Tea case, where a blend of tea sold as "the kind of tea the Chinese drink"

---

10. *Fetridge v. Wells,* 13 How. (N. Y. Pract.) 385, 389 (Superior Ct. 1857).

11. *Worden v. California Fig Syrup Co.,* 187 U. S. 516, 528 (1903).

was shown to be unknown in China,[12] in today's world would be resolved on broader equitable grounds. As Judge Learned Hand said in the Second Circuit's opinion in *Dwinell-Wright Co. v. White House Milk Co.*, 132 F. 2d 822, 825 (2d Cir. 1943) : "Here, as often, equity does not seek for general principles, but weighs the opposed interests in the scales of conscience and fair dealing." Putting this another way, equitable estoppel may bar the relief sought. In the *White House* case, the complainant knew of the defendant's use of the brand name on its cans of evaporated milk, and was selling White House tea and coffee to the defendant for resale. In denying relief, the court said "* * * the owner may have so conducted himself as impliedly to assure the newcomer that he does not object, and the newcomer may have built upon that assurance." 132 F. 2d at 825.

Or, as was said in *Holly Hill Citrus Growers' Assn. v. Holly Hill Fruit Products, Inc.*, 75 F. 2d 13, 17 (5th Cir. 1935) :

> "There is a kind of evidential estoppel which, though it may not amount to a complete estoppel in pais, is raised when persons who have spoken or acted one way under one set of circumstances, and with one objective in mind, undertake under other circumstances and when their objective has changed, to testimonially give a different color to what they formerly said and did."

We think that principle applies here. Drossner is estopped from challenging the validity of a licensing system which he used to his own advantage when he obtained the Towson and Glen Burnie franchises, and from attempting to impose upon Mascaro limitations with respect to access to communications media which he did not assert against Towson and Glen Burnie. To permit him to do so would be to sanction the weaving of the very web of broader exclusivity which he failed to achieve by contract. Baltimore Snelling's bill of complaint should have been dismissed.

*Decree reversed; injunction vacated;*
*costs to be paid by the appellee.*

---

12. *Kenney v. Gillet*, 70 Md. 574, 17 A. 499 (1889).

236

BARNES, J., dissenting:

I dissent because in my opinion (1) the Chancellor's construction of the licensing agreement of July 5, 1960, was correct, and (2) the defense of estoppel, although sound as an abstract principle, is not applicable and, in any event, is not available in this case because it was not raised in the lower court and was not briefed by the appellant in this appeal.

1.

The Chancellor, in my opinion, correctly construed the licensing agreement of July 5, 1960, as an agreement by Philadelphia Snelling to grant to Baltimore Snelling the *exclusive* right to use the name Snelling & Snelling in Baltimore City. This exclusive right was to be used in connection with one office only which was to be opened by Baltimore Snelling in Baltimore City. As I read paragraph 1(a) this is what the licensing agreement states. This is confirmed, in my opinion, by the provisions of paragraph 9 of the licensing agreement whereby Baltimore Snelling agreed when requested by Philadelphia Snelling to waive objections which Baltimore Snelling might legally have against the use of the name "Snelling and Snelling" in territories *other than the territory* granted to Baltimore Snelling.

It is well established that the primary source for determining the intention of the parties to a contract is the language used by the parties. *Kelley Construction Co. v. Washington Suburban Sanitary District,* 247 Md. 241, 230 A. 2d 672 (1967); *Cadem v. Nanna,* 243 Md. 536, 221 A. 2d 703 (1966). The words of the contract are to be understood in their plain, ordinary and popular sense, unless they have acquired a peculiar sense by trade usage or for some other cause. *Highley v. Phillips,* 176 Md. 463, 5 A. 2d 824 (1939). It is only when the words of the contract, used in their ordinary sense, are vague, doubtful or ambiguous, that extrinsic evidence is admissible to determine the intention of the parties. *Coopersmith v. Isherwood,* 219 Md. 455, 150 A. 2d 243 (1959). As pointed out in the majority opinion, the Pennsylvania law is to the same effect.

The Chancellor concluded that Baltimore Snelling acquired the legal right, by the terms of the licensing agreement, to the

*exclusive* use of the name "Snelling and Snelling" in Baltimore City in connection with its office located in that area, that the operation of Mascaro, by soliciting and advertising, could not be effectively confined within his Dundalk-Essex franchise area without invading some sections of Baltimore City, and that this operation violated Baltimore Snelling's exclusive right to use the name "Snelling and Snelling" in its franchise area. In my opinion the Chancellor's conclusion was correct and carries into effect the intention of the parties to the licensing agreement as disclosed by the words of the contract itself. The purpose of the exclusive grant was to protect the franchisee from competition within the franchise area and this was a lawful provision.

The majority indicates that the exclusive right to use the name in Baltimore City in connection with one office in that City "is not an unrestricted right" and that "Philadelphia Snelling retained a right and could assign to others the right to use the name in Baltimore in ways not connected with the Baltimore office. To hold otherwise would give rise to the conclusion that Baltimore Snelling might, if it wished, prevent Philadelphia Snelling from advertising in magazines which circulated in Baltimore." It was further stated "This was clearly not intended by any one." With great respect, this appears to me to beg the question. The language of the contract gives an unrestricted right against those who can *compete* with Baltimore Snelling, not against national advertising generally or advertising by franchisees who geographically cannot compete with Baltimore Snelling as a practical matter. There is no contention that Philadelphia Snelling could grant another franchise for another office to someone other than Baltimore Snelling in Baltimore City. It seems clear that Baltimore Snelling then has the exclusive right to use the Snelling name in Baltimore City in connection with that one office and no one else can be granted any right to use the name in Baltimore City in competition with Baltimore Snelling. The conclusion of paragraph 1 (a) provides:.

> "Licensee (Baltimore Snelling) shall not directly or indirectly establish an office or place of business, or move to any locations outside of such territory; nor shall licensee [Baltimore Snelling] change its name without obtaining the written consent of Snelling

> [Philadelphia Snelling] ; nor shall licensee [Baltimore Snelling] establish any branch or additional office without the written consent of Snelling [Philadelphia Snelling]."

This provision indicates that there are two prohibitions on the activities of Baltimore Snelling, (1) that only one office will be maintained that one in its *territory,* and (2) that there will be no change in its *name.* Paragraph 9 provides for waiver by Baltimore Snelling in territories *other than* the territory granted to Baltimore Snelling. This language clearly indicates that the territory granted to Baltimore Snelling is Baltimore City (it is the only *territory* mentioned in paragraph 1) and there is no provision that there will be any waiver of objection to the use of the name "Snelling and Snelling" in *that territory.* This language confirms the exclusive nature of the grant to Baltimore Snelling.

Assuming, *arguendo,* that the licensing agreement is ambiguous, the extrinsic evidence, in my opinion, confirms the Chancellor's construction of the contract. When the licensing agreement was negotiated, the prior franchisees in the Baltimore area had failed badly in their operation, leaving a collection of unpaid bills and ill will behind them. The *name* "Snelling and Snelling" was at that point a liability rather than an asset. In short, the situation gave rise to a franchisee's "market," as it were, and Philadelphia Snelling was obliged to give Baltimore Snelling a licensing agreement most beneficial to the franchisee and at a small license payment in order to obtain a competent and qualified operator who would enter the unfortunate situation in Baltimore.

In addition to the specific situation in the Baltimore area, Philadelphia Snelling in 1960 had not enlarged its licensing operations to the substantial size it enjoys at the present time. Here again it was necessary to give favorable licensing agreements to its franchisees in order to build up its business at that time. It is significant that after the situation in Baltimore was rectified and Philadelphia Snelling's business had substantially expanded, a *different* form of contract from which the word "exclusive" was removed was used by Philadelphia Snelling, and

more substantial original license payments were required. It seems clear that Philadelphia Snelling believed that there was a substantial legal difference between a licensing agreement containing the word "exclusive" and one from which that word was excluded. It is unreasonable to suppose that Baltimore Snelling would have proceeded to make the very substantial payments for advertising and other promotional items [1] if it had not believed that it had the exclusive right for which it had successfully bargained.

Then too, the licensing agreement of July 5, 1960, was prepared by Philadelphia Snelling. It is well settled that in the event of ambiguity in the contract, it is to be construed against the party preparing it. *Hughes & Co. v. Pioneer,* 230 Md. 36, 185 A. 2d 383 (1962). Applying this maxim of construction to the licensing agreement, the ambiguity would be resolved against Philadelphia Snelling and the Chancellor's construction sustained.

2.

In the majority opinion, as an alternative ground for reversing the Chancellor's decree, it is indicated that Baltimore Snelling is equitably estopped from challenging the validity of the licensing system which Drossner "used to his own advantage when he obtained the Towson and Glen Burnie franchises and from attempting to impose upon Mascaro limitations with respect to communications media he did not assert against Towson and Glen Burnie." Although the basic principle of estoppel is sound in a proper case, in my opinion, it is not applicable in the present case, as Drossner was *himself one of the principals* in the Towson and Glen Burnie franchises. The granting of these franchises was not injurious to the exclusive franchise granted to Baltimore Snelling inasmuch as a substantial part of the profits of their operation accrued to the principal in Baltimore Snelling. The obtention of the Glen Burnie and Towson franchises might possibly establish an equitable estoppel, prima facie, against Drossner in his contention that Baltimore Snelling's franchise included areas outside of Baltimore City, but it

---

1. The testimony indicates that amounts up to $118,000.00 per year were spent on these items.

would not, in my opinion, operate as an estoppel to insist on the exclusive franchise as against Mascaro, a competitor. More importantly, it would seem that merely because Drossner permitted one person to infringe his exclusive franchise, he would not be prevented from enforcing that franchise against another infringement by a different person.

Assuming for the argument that the estoppel would otherwise be effective against Drossner, in my opinion the estoppel is not available to Mascaro in this case because it was not raised, considered or passed upon by the Chancellor in the trial court and was not briefed or argued before us on this appeal.

It is indicated in the majority opinion that Mascaro in his answer to the bill of complaint asserted the defense that the plaintiff was guilty of "unclean hands" and the inference is that this affirmative defense sufficiently raised the question of estoppel. In my opinion, the raising of this affirmative defense does not raise the question of estoppel against Drossner by his acquisition as one of the principals of the Towson and Glen Burnie franchises. Paragraph 20 of the Mascaro answer alleges:

> "20. Further answering, Complainant is guilty of unclean hands in that the Bill of Complaint, which prayed under oath an ex parte injunction which was successfully obtained and then dissolved on motion of Defendant, fails to make a full and frank disclosure of all the facts, to wit, that both Complainant and Defendant are licensees of Snelling and Snelling, Inc., owners of the registered trade name "Snelling and Snelling" by virtue of contracts dated July 5th, 1960, and November 4th, 1965, respectively."

There is nothing alleged in paragraph 20 to suggest any estoppel of Drossner by having acquired, as one of the principals, the Towson and Glen Burnie franchises. The reference in paragraph 20 is to licenses acquired under the licensing agreements of Baltimore Snelling and Mascaro, dated July 5, 1960 and November 4, 1965 respectively. The Chancellor does not mention or pass upon any estoppel point in his written opinion and there is nothing concerning it in the final decree. The point is not mentioned in the briefs of the respective parties and the cases cited

on this point by the majority are not cited. There was no argument before us on the point.

Under these circumstances the point is not available to Mascaro as a ground for reversal in this case. Maryland Rule 885 provides that this Court "will not ordinarily decide any point or question which does not plainly appear by the record to have been decided by the lower court." In my opinion, the point was not presented to the lower court and I see no reason to decide the point here. See *Elko v. Elko,* 187 Md. 161, 49 A. 2d 441, 168 A. L. R. 256 (1946).

Then too, we have rather consistently held that even if a point were raised and decided by the lower court, it will be deemed to be waived on appeal if the point is not briefed in this Court. *Harmon v. State Roads Commission,* 242 Md. 24, 217 A. 2d 513 (1966); *Myers v. Chief of Baltimore County Fire Bureau,* 237 Md. 583, 207 A. 2d 467 (1965). For this additional reason, the estoppel point is not available to Mascaro in this case as a ground for the reversal of the Chancellor's decree.

I would affirm the decree.