## NATIONAL SHOE STORES COMPANY *v.* NATIONAL SHOES OF NEW YORK, INC. ET AL.

(Two Appeals in One Record)

[No. 178, October Term, 1956.]

330

*Decided May 10, 1957.*

The cause was argued before Brune, C. J., and Collins, Henderson, Hammond and Prescott, JJ.

*William Saxon* for the appellant and cross-appellee.

*David Ross,* with whom were *Ober, Williams, Grimes & Stinson* on the brief, for the appellees and cross-appellants.

HENDERSON, J., delivered the opinion of the Court.

This appeal and cross-appeal are from a decree of the Circuit Court of Baltimore City enjoining the appellees from using, in a trading area comprising Baltimore City and adjoining counties, the words· "National Shoes" unless accompanied by a disclaimer of any connection with the appellant, or accompanied by the words "The" and "of New York, Inc.". The scope of the injunction was limited to the trading area mentioned, and to exterior display signs and window displays. The decree dismissed that part of the bill which prayed an accounting and damages. The appellant contends that it is entitled to the exclusive use of the name. The cross-appellant·contends that no ground for relief was shown.

The appellant corporation was organized by the Stein brothers in Maryland in 1940, and has since used its corporate name in connection with various stores. It succeeded a partnership formed in 1938 that had adopted the same name. It presently operates four stores in the Baltimore area and another store in Alexandria, Virginia. The appellee, National Shoes, Inc., was incorporated in New York in 1938, succeeding a partnership trading as National Shoe Market that began business in Newark, New Jersey, in 1923, and had stores in New York as early as 1930. The appellee, The National Shoes of New York, Inc., is a wholly owned subsidiary that was incorporated in Maryland in August, 1955. The parent company, National Shoes, Inc., and its subsidiary and affiliated corporations, operate 116 retail shoe stores in New York, Massachusetts, Connecticut, New Jersey and Maryland as one integrated chain.

National Shoes, Inc., sought to expand its operations into Maryland in 1954. Upon discovery of the appellant's use of the name National Shoes, Mr. Siegel, an officer of the New York corporation, negotiated for the purchase of the appellant's stores. He testified he wished to make the purchase to avoid any controversy over the use of the name, to obtain outlets for its product more quickly, and to avoid benefiting

the appellant by the national advertising of his company. A tentative agreement was reached on the basis of book value which showed a net worth of some $38,000.00, but negotiations fell through when the officers of the appellant placed a value of $100,000.00 on the good will or use of the name. In November, 1955, the appellees opened their first store in the Ritchie Highway Shopping Center in Anne Arundel County, south of Baltimore City. Since that time the store has been selling the full line of appellees' merchandise, including low to medium priced shoes and accessories in the same price range as those sold by the appellant. The sign on the outside of this store emphasizes the words of the corporate name, "National Shoes", in somewhat larger letters than the words "The" and "of New York, Inc.". The appellees plan to open another store in the Mondawmin Shopping Center, in the northwest section of the City.

While, as we have stated, the appellant and its predecessor partnership began the use of the name "National Shoe" in 1938, it was brought out that one of its stores was discontinued and others turned over in 1954 to one of the Stein brothers who continued the business in the name of Murray Shoe Store Company. The appellant had a very small profit in 1954, and did business at a loss during the first six months of 1955. Of the five stores now in operation, three are located in the eastern part of the City, or Baltimore County, in Highlandtown, Essex and Dundalk, which were opened between 1947 and 1952. The fourth store is located at 2003 West Pratt Street, and was opened in 1941. The store in Alexandria, Virginia, was opened in 1953. It was brought out that while the appellant used its corporate name on its stores, it featured on its signs and displays certain manufacturers' trade names of shoes, such as "Poll Parrot", "Red Goose" and "Debenette". It sells about 50 different brands in all. For the appellant, it was claimed that about 50% of the boxes on its shelves bore the name "National Shoes". For the appellees, it was claimed that the percentage was only 5%. There was also testimony that one of the Stein brothers prior to 1938 had been a factory superintendent of the Muskin Shoe Company, a manufacturer making shoes for National

Shoe Market and stamping the name National Shoes on the product. It was also shown that some of the shoes sold by the corporation controlled by the Stein brothers had actually been manufactured for National Shoes, Inc., and purchased by the appellant from jobbers.

It was shown that the advertising of the appellant was of a very limited character. For the year 1955, the advertising bill of the four Baltimore stores was only $1,166.98, for the year 1954, $850.00. Almost all of the advertising was in the form of handbills, or in neighborhood newspapers. On the other hand, it was shown that the appellees spent over $3,000.00 on advertising for their Ritchie Highway store subsequent to its opening in November, 1955, and since 1949, they have spent over $2,000,000.00 on newspaper, radio and television advertising. All of their shoes are manufactured to their specifications and sold under the trade name of "National Shoes", whereas all of the shoes sold by the appellant are purchased through wholesalers or jobbers.

The appellant contends that it has rights entitled to protection in the name "The National Shoe Stores Company" under Code (1951), Art. 23, sec. 5 (a) (3), and to the use of the name "National Shoes" under the law of trade-marks and unfair competition. The section provides that the name of a corporation organized in Maryland "Shall not be the same as the name of any corporation of this State, * * * or so similar to any such name as to be misleading." Code (1951), Art. 23, sec. 124 (a), provides that "The [State Tax] Commission shall not accept for record any charter paper of a corporation of this State, which is not in conformity with law." Section 127 (b) provides that upon acceptance for record by the Commission of any articles of incorporation, "Such acceptance for record shall be conclusive evidence of the formation of the corporation except in a direct proceeding by the State for the forfeiture of the charter." Section 5 (a) (3) had its statutory genesis in the 1951 revision of Article 23 (Acts 1951, ch. 135) and was based on a prior administrative practice. It was taken practically verbatim from the Model Corporation Act drafted by a committee of a section of the American Bar Association. A committee note

states that its purpose is to protect the right of a corporation to its own name. See also *Brune, Maryland Corporation Law and Practice* (Rev. ed.), p. 679. The purpose of the practice, and now of the statute, was doubtless to avoid confusion by the general public and also by the Commission itself in carrying out its administrative duties. However, it does not in terms give a pre-existing corporation the right to object to the acceptance of a charter either before or after acceptance. It has been held that such a right is not created under similar statutory provisions. *American Order of Scottish Clans v. Merrill*, 24 N. E. 918 (Mass.) (per Holmes, J.). The State Tax Commission is not a party to the instant case and its action cannot be reviewed in this proceeding. Cf. *Motor Club of America v. Curran*, 83 N. Y. S. 2d 733, aff'd 85 N. Y. S. 2d 552. *Investors Syndicate of America v. Hughes*, 38 N. E. 2d 754, 758 (Ill.), relied on by the appellant, was an action of *mandamus* against the custodian of charter records.

In any event, giving the widest scope to the new section, it would appear to merely restate the common law rule relating to protection of corporate names. See *Brune, supra,* pp. 23, 24. In *Drive It Yourself Co. v. North*, 148 Md. 609, 614, Judge Walsh, for the Court, said: "There is no statute in Maryland governing the right of a corporation to the exclusive use of its own name, but such right exists at common law, and it includes the further right to prohibit another from using a name so similar to the corporate name as to be calculated to deceive the public. *Afro-American Owls v. Talbot*, 123 Md. 465." In 6 *Fletcher, Cyclopedia of Corporations*, § 2423, p. 31, it is said in regard to relief based on a statute rather than on the common law rule: "The matter is not of vital importance, for the corporate name will, in any event, be protected on the same principles as a trade name or trademark. * * * ."

The cases dealing with name protection tend to fall into three categories. See *Nims, Unfair Competition and Trade-Marks* (4th ed.), § 10, 11. The first of these involves the protection of a name consisting of distinctive, unique or fanciful words. Such names are generally referred to as technical

trade-marks and, usually, the appropriation of such words alone is sufficient to give rise to a protectible right in the name. The trial court found that the words "National Shoes" are not fanciful or distinctive and thus not subject to exclusive appropriation as a technical trade-mark. In *National Shoe Corporation v. National Shoe Mfg. Co.,* 19 N. E. 2d 734, 736 (Mass.), the court observed that "there is nothing peculiar or distinctive in the words 'National Shoe'." See also *National Grocery Co. v. National Stores Corporation,* 123 A. 740, aff'd 127 A. 925 (N. J.) and *National Brands Stores v. Muse & Associates,* 187 S. E. 84 (Ga.). As pointed out in *Edmondson Vil. Theatre v. Einbinder,* 208 Md. 38, 46, a geographical name may not be appropriated as an exclusive trade name or trade-mark, although it may acquire a secondary meaning. It was also pointed out in that case that a corporation, like an individual, generally has a right to use its own name, in the absence of any fraudulent or wrongful intention or act, or any contract to prohibit it.

The second category consists of cases where actual fraud or deceit is employed by a subsequent user of a name for the purpose of diverting the trade of a prior user. See *Bedding Corporation v. Moses,* 182 Md. 229. Indeed such action, with intent to defraud, may constitute a criminal offense. See Code (1951), Art. 27, sec. 219. The trial court in the instant case found that the appellees were not guilty of fraud or deceit; that the appellees had made no "attempt to capitalize on the complainant's good will", but that the opening of its store in Maryland was "the result of a natural expansion of the respondent's chain of stores". The appellant does not claim actual fraud or deceit.

The third category consists of cases affording protection to a name which, although it consists of words in common use taken from the public domain, has acquired a secondary meaning through association with the seller's product or business in the minds of the general public. The appellant relies most strongly upon this principle, which finds support in the Maryland cases. In *Bedding Corporation v. Moses, supra,* p. 237, quoting from *Merriam Co. v. Saalfield,* 198 F. 369, 373, it was said: "Primarily, it would seem that one might appro-

priate to himself for his goods any word or phrase that he chose; but this is not so, because the broader public right prevails, and one may not appropriate to his own exclusive use a word which already belongs to the public and so may be used by any one of the public. Hence comes the rule, first formulated in trade-mark cases, that there can be no exclusive appropriation of geographical words or words of quality. This is because such words are, or may be, aptly descriptive, and one may properly use for his own product any descriptive words, because such words are of public or common right. It soon developed that this latter rule, literally applied in all cases, would encourage commercial fraud, and that such universal application could not be tolerated by courts of equity; hence came the 'secondary meaning' theory. There is nothing abstruse or complicated about this theory, however difficult its application may sometimes be. It contemplates that a word or phrase originally, and in that sense primarily, incapable of exclusive appropriation with reference to an article on the market, because geographically or otherwise descriptive, might nevertheless have been used so long and so exclusively by one producer with reference to his article that, in that trade and to that branch of the purchasing public, the word or phrase had come to mean that the article was his product; in other words, had come to be, to them, his trade-mark."

In that case an injunction was sought by a partnership trading as Baltimore Spring Bed Co. against Baltimore Bedding Corporation. While it was held that a secondary meaning had not been established, it was held that actual fraud was proved. In *A. Weiskittel Co. v. Weiskittel Co.*, 167 Md. 306, the case turned on the use of the name Weiskittel. Since it was a surname, and hence not subject to exclusive appropriation, the Court held that proof of secondary meaning was necessary, and it found the proof lacking, relying largely upon the fact that the complainant had featured the name of its product, "Fire King", more than its name. It found no evidence that the defendants had done any act "to fool the public into the belief that their goods are the goods of the plaintiff". In *Drive It Yourself Co. v. North,*

*supra,* a company that had been in business for eighteen years sought to enjoin a competitor from using the name "Saunders Drive It Yourself System". The respondent was a branch of a large organization with branches in many cities that had recently opened a branch in Baltimore. The Court held there was no proof of secondary meaning and found (p. 618) that it "would certainly not be justified in holding that the public generally in Baltimore understands the 'drive it yourself' business to mean the appellant's business." As stated in *Nims, Unfair Competition and Trade-Marks* (4th ed.), § 334: "Secondary meaning must be proved by a fair preponderance of the evidence of an association between the name * * * and * * * seller in the minds of a substantial number of those members of the public who normally would be interested in the product and who might be purchasers of it." See also *Hecht Co. v. Rosenberg,* 165 Md. 116, 119, and *Neubert v. Neubert,* 163 Md. 172, 174.

It is the general rule, although there are cases to the contrary, that in the absence of proof of secondary meaning, no injunctive relief may be granted even though there is a possibility of confusion. See Note, 150 A. L. R. 1067. The Maryland cases cited seem to be in accord with the general rule. However, the authorities seem to differ as to the character or quantum of proof of secondary meaning. According to what seems to be the better view, proof of actual confusion in specific instances is not necessary, nor is the inquiry limited to the exact locations where competition is shown to occur, particularly under modern conditions.

In the instant case there was certainly no proof of damages. Cf. *Rossi v. Mewshaw,* 195 Md. 323. There was no proof that any customer was deceived into thinking he was dealing with the appellant when dealing with the appellees. But this would not necessarily be controlling. "The determining factor is not that people have actually been deceived, but that there is a likelihood of that happening." *Ajax Tool Co. v. Buchalter Tool Co.,* 211 N. Y. S. 241, 243; *Nims,* op. cit., § 335, p. 1049. It is true that in the instant case the appellant's stores are not located in the same sections of the trading area as the appellees' store now in operation, and that

the appellant's advertising is of a local or community character. There is far more danger that the national advertising of the appellees, by radio and television, may boost the sales of the appellant, than *vice versa*. Nevertheless, the similarity of corporate names is striking, particularly since both parties feature, to some extent at least, the same brand name.

The appellant was clearly first in the local field, and we think some risk of confusion has been established, although no actual deception is proved. This risk is, of course, minimized by the Chancellor's decree, which follows the pattern laid down in the cases. While courts have been slow to enjoin altogether the use of similar names, they have not been slow to minimize confusion, where a probability of confusion is shown. See *Restatement, Torts,* §§ 717, 731; *Little Tavern Shops v. Davis,* 116 F. 2d 903; *Howards Clothes v. Howard Clothes Corp.,* 52 N. W. 2d 753 (Minn.). The case last cited is quite close to the instant case on the facts. The extent of the relief granted is usually left to the sound discretion of the chancellor. *American Waltham W. Co. v. United States W. Co.,* 53 N. E. 141 (Mass.). Under the circumstances, and in view of the probability of further expansion by the appellees in the trading area mentioned, we are not prepared to hold that the Chancellor was wrong either in refusing to require the appellees to discontinue the use of the words "National Shoes" or in requiring the appellees to use the full corporate name of the Maryland subsidiary on its stores.

*Decree affirmed, costs to be divided between the parties.*