92 Cal.App.3d 98 (1979)
154 Cal. Rptr. 794
NORTH CAROLINA DAIRY FOUNDATION, INC., et al., Plaintiffs and Respondents,
v.
FOREMOST-McKESSON, INC., et al., Defendants and Appellants.
Docket No. 40485.
Court of Appeals of California, First District, Division One.
April 19, 1979.
*102 COUNSEL
Flehr, Hohbach, Test, Albritton & Herbert, Milton W. Schlemmer and David J. Brezner for Defendants and Appellants.
Cooper, Taylor, Higbe & Sands, W. Austin Cooper, Barbara E. Schur, William H. Birnie and Warren N. Brakensiek as Amici Curiae on behalf of Defendants and Appellants.
Townsend & Townsend, Anthony B. Diepenbrock, Roger L. Cook and Marvin W. Murray for Plaintiffs and Respondents.
OPINION
RACANELLI, P.J.
Defendants, Foremost-McKesson, Inc. and Weyerhaeuser Company, appeal from an order granting a preliminary injunction in favor of plaintiffs, North Carolina Dairy Foundation, Inc. (Foundation), G.P. Gundlach & Company, and Knudsen Corporation, enjoining defendants from infringing upon plaintiffs' trademark "Sweet Acidophilus" (hereafter "SA") or engaging in any domestic marketing *103 activities using such trademark or any colorable imitation. Defendants contend that the trial court's findings that the term is a protectable trademark through acquisition of a secondary meaning is not supported by law or the evidence. Our view of the record in light of established principles impels a contrary conclusion requiring affirmance of the challenged order.

Procedural Background
Plaintiffs filed a complaint for trademark infringement and unfair competition and false and misleading advertising alleging in substance that: plaintiff Foundation, a nonprofit foreign corporation, developed and perfected a new strain of lactobacillus acidophilus (LBA), a fermenting bacteria used in milk products to aid digestion. The new culture and processing technique eliminates the sour-taste effect caused by the fermenting LBA additive producing a natural or "sweet" tasting milk containing the beneficial digestive properties. Plaintiff Foundation coined and adopted the term "SA" as a trademark for such milk products and granted exclusive promotion and licensing rights to plaintiff Gundlach. Plaintiff Knudsen, the exclusive California sublicensee, undertook an extensive sales and promotional campaign in northern California to establish a market for its newly trademarked products. Within weeks, defendant Foremost, using milk cartons manufactured by defendant Weyerhaeuser, began distribution of its own Tuttle name-brand milk products prominently featuring a similar "SA" mark (see appendix) in a manner likely to create buyer confusion as to the product source. Defendants answered generally denying the charging allegations and alleging the mark possessed no inherent trademark significance and had not acquired a secondary meaning justifying trademark protection.
Plaintiffs' motion for a preliminary injunction was heard and determined on the basis of numerous declarations and exhibits submitted by the parties and amici.[1] In granting relief, the trial court found the term "SA" to be plaintiffs' protectable trademark and had acquired a secondary meaning. On January 6, 1977, we granted Foremost's petition for supersedeas pending appeal; on March 3, 1977, the California Supreme Court granted hearing, denied supersedeas and retransferred the cause to this court for further proceedings.

*104 Issue

The single question presented is whether the term "SA" under the circumstances shown possesses protectable trademark significance appropriate for preliminary relief.
Defendants argue that the generic and descriptive words "sweet" and "acidophilus," cannot be exclusively appropriated from the public domain and that a mark comprised of such words cannot attain trademark significance through an acquired secondary meaning. Moreover, it is argued, the evidence supporting plaintiffs' trademark claim is insufficient and the resulting preliminary injunction constituted an abuse of discretion. Plaintiffs counterargue that the composite mark is protectable as (1) an inherently distinctive term or (2) a descriptive term with an acquired secondary meaning. We conclude that the record adequately sustains the latter argument and that interim relief was properly granted.[2]

Scope of Review
(1) In reviewing the conflicting evidence supporting the issuance of the preliminary injunction, we must apply the test of substantial evidence and indulge all reasonable inferences in support of the findings implicit in the trial court's determination. (People v. Columbia Research Corp. (1977) 71 Cal. App.3d 607, 610 [139 Cal. Rptr. 517]; City and County of San Francisco v. Evankovich (1977) 69 Cal. App.3d 41, 54 [137 Cal. Rptr. 883]; Metro-Goldwyn-Mayer, Inc. v. Lee (1963) 212 Cal. App.2d 23, 27-28 [27 Cal. Rptr. 833]; 6 Witkin, Cal. Procedure (2d. ed. 1971) Appeal, § 249, p. 4241.) In doing so, we look to determine whether in exercising its discretion the trial court properly balanced the respective interests and resulting inconvenience to the parties (Williams v. Los Angeles Ry. Co. (1907) 150 Cal. 592, 596 [89 P. 330]) with the objective of preventing manifest injustice pending trial on the merits. (See Metro-Goldwyn-Mayer, Inc. v. Lee, supra, 212 Cal. App.2d 23, 31-32.) If the evidence supports an implied finding that injunctive relief pendente lite is required in order to prevent probable irreparable injury, a reviewing court may not overturn the exercise of such discretion. (See Winfield v. Charles (1946) 77 Cal. App.2d 64, 70 [175 P.2d 69]; Sun-Maid Raisin *105 Growers v. Mosesian (1927) 84 Cal. App. 485, 497 [258 P. 630]; see generally 2 Witkin, Cal. Procedure (2d ed. 1970) Professional Remedies, § 80, pp. 1518-1519.) Guided by such principles, we examine the merits of the appeal.

Evidence
The documentary evidence, viewed in a light favorable to plaintiffs (Metro-Goldwyn-Mayer, Inc. v. Lee, supra, 212 Cal. App.2d 23, 27-28) reveals the following:
For many years, a micro-organism known by its Latin name, LBA (a lactic acid fermenting agent), has been added to milk as an aid to digestion. When combined with the normal lactic acids, the resultant fermented milk, commonly called acidophilus milk (see Agr. Code, § 38521[3]); Webster's Third New Internat. Dict., p. 17) acquires a sour taste. In the early 1970s, Foundation research developed a new strain of LBA which when added to milk neither causes fermentation nor affects the natural or "sweet" taste of the milk. The composite term "SA" was coined and adopted as the product trademark at the commencement of promotional activities in early 1974. Efforts to register the new mark with the federal patent and trademark office and the California Secretary of State were rejected on the grounds the mark was merely a generic or descriptive term. Since the resulting milk product is not truly acidophilus milk,[4] federal and state regulatory agencies considered the words "SA" as simply a fanciful term, adopting the generic term "lowfat milk with lactobacillus acidophilus culture added" to officially describe the product. (See Cal. Admin. Code, tit. 3, § 407.22.) By mid-year of 1976, Gundlach had licensed 54 dairies throughout the country to use the newly developed culture process and term in marketing their milk products; nearly $3 million were expended by the licensees in promoting "SA" milk products yielding gross sales of about $10 million. In the spring of 1976, Knudsen began a promotional campaign in the Fresno area expanding to *106 the San Francisco Bay area by mid-summer; a total of $300,000 was spent during the promotional effort. Knudsen soon experienced a significant increase in its general sales revenues. A market survey (Lampa) conducted in early October 1976, disclosed a high level of product-source recognition among consumers. In mid-August 1976, Foremost began marketing a similar milk product under its Tuttle brand in cartons (manufactured by Weyerhaeuser) prominently displaying the term "SA" in conjunction with the required generic description (see appendix). Foremost engaged in virtually no promotional advertising. Two weeks later, plaintiffs instituted the underlying litigation.

I

Generic and Descriptive Terms
(2) Under common law principles governing mercantile trademarks, only inherently distinctive marks (i.e., fanciful, arbitrary or suggestive) used to identify a particular product are protectable immediately upon use without necessity for proof of secondary meaning.[5] (Blisscraft of Hollywood v. United Plastics Co. (2d Cir.1961) 294 F.2d 694, 698-700; 1 McCarthy, Trademarks and Unfair Competition, §§ 11:2-11:3, 15:1, pp. 346-348, 514 (hereafter McCarthy).) If the mark consists of a generic or common descriptive term, however, it falls within the public domain of free usage and cannot be exclusively appropriated as a protectable trademark. (Miller Brewing Co. v. G. Heileman Brewing Co., Inc. (7th Cir.1977) 561 F.2d 75 [cert. den., 434 U.S. 1025 (54 L.Ed.2d 772, 98 S.Ct. 751)]; Dryice Corporation v. Louisiana Dry Ice Corporation (5th Cir.1932) 54 F.2d 882; Skinner Mfg. Co. v. General Food Sales Co. (D.Nev. 1943) 52 F. Supp. 432; Kellogg Co. v. Nat. Biscuit Co. (1938) 305 U.S. 111 [83 L.Ed. 73, 59 S.Ct. 109]; Ball v. American Trial Lawyers Assn. (1971) 14 Cal. App.3d 289, 302 [92 Cal. Rptr. 228]; Applebaum v. Senior (1957) 154 Cal. App.2d 371, 374 [316 P.2d 410]; 3 Witkin, Summary of Cal. Law (8th ed. 1973) Personal Property, § 46, pp. 1657-1658; see generally 3 Callmann, The Law of Unfair Competition, Trademarks and Monopolies (3d ed. 1969) §§ 70.1-70.4, pp. 106-112; 1 McCarthy, §§ 11:5, 12:2, pp. 352-353, 407; 74 Am.Jur.2d, Trademarks and Tradenames, §§ 40, 46-52, pp. 727, 730-734; 47 Cal.Jur.2d, Trademarks, §§ 5-6, pp. 717-719; cf. Bus. & Prof. Code, § 14220, subd. (e)(1), and 15 U.S.C. § 1052(e)(1).)
*107 Thus, in a literal sense, a truly generic[6] term whose principal significance is generally understood to describe an article or class of things (see Stix Products, Inc. v. United Merchants & Mfrs., Inc. (S.D.N.Y. 1968) 295 F. Supp. 479, 487-488; Rest., Torts (1938) § 721, com. a) cannot attain trademark significance so as to justify the effective denial of its use to others in describing their own products; stated differently, a generically descriptive term which merely describes the qualities, ingredients or characteristics of a product, lies within the public domain subject to general usage and, in the absence of an acquired secondary meaning, is not entitled to trademark protection. (See Miller Brewing Co. v. G. Heileman Brewing Co., supra, 561 F.2d 75, 79, and authorities there cited; 1 McCarthy, §§ 11:5-11:6, pp. 352-356, see examples of descriptive marks collected at pp. 358-360.)

II

Doctrine of Secondary Meaning
(3) An otherwise descriptive term or mark may achieve a protectable status whenever the quality of distinctiveness has  in fact  been acquired through a demonstrated secondary meaning. (Armstrong Co. v. Nu-Enamel Corp. (1938) 305 U.S. 315, 335-336 [83 L.Ed. 195, 207, 59 S.Ct. 191]; Coca-Cola Co. v. Koke Co. (1920) 254 U.S. 143 [65 L.Ed. 189, 41 S.Ct. 113]; Carter-Wallace, Inc. v. Procter & Gamble Company (9th Cir.1970) 434 F.2d 794, 802; W.E. Bassett Company v. Revlon, Inc. (2d Cir.1966) 354 F.2d 868, 871; Jackson v. Universal Internat. Pictures (1950) 36 Cal.2d 116 [222 P.2d 433]; Academy of Motion Picture, etc. v. Benson (1940) 15 Cal.2d 685 [104 P.2d 650]; Metro-Goldwyn-Mayer, Inc. v. Lee, supra, 212 Cal. App.2d 23; see generally 47 Cal.Jur.2d, Trademarks, § 27, pp. 746-747; 74 Am.Jur.2d, Trademarks and Tradenames, §§ 64-68, *108 pp. 740-744, §§ 169-173, pp. 819-822; Callmann, op. cit., § 77; 1 McCarthy, §§ 11:9, 15:1, pp. 361, 514.) Protection is extended when, in addition to the literal meaning of the words used, a subsequent significance is added thereto and becoming in the market place its usual and primary significance (see Ball v. American Trial Lawyers Assn., supra, 14 Cal. App.3d 289, 302); secondary meaning is said to attach when the descriptive words used in connection with a product have acquired a general understanding in the relevant marketplace area identifying that product with a unique or particular source. (See Academy of Motion Picture, etc. v. Benson, supra, 15 Cal.2d 685, 688-690; Applebaum v. Senior, supra, 154 Cal. App.2d 371, 374; Rest., Torts (1938) § 716, com. b.)
(4) The purpose of the equitable doctrine is to prevent unfair competition through misleading or deceptive use of a term exclusively identified with the claimant's product and business (see Academy of Motion Picture, etc. v. Benson, supra, 15 Cal.2d 685, 689-690), affording judicial protection whenever "the name and the business [through continued association] become synonymous in the public mind; and submerges the primary meaning of the name ... in favor of its meaning as a word identifying that business." (Visser v. Macres (1963) 214 Cal. App.2d 249, 253 [29 Cal. Rptr. 367].) The crucial element is the mental association in the buyer's mind between the mark used in connection with the product and a single source of origin. (Carter-Wallace, Inc. v. Procter & Gamble Company, supra, 434 F.2d 794; Mac Sweeney Enterprises v. Tarantino (1965) 235 Cal. App.2d 549 [235 P.2d 266]; Visser v. Macres, supra, 214 Cal. App.2d 249; National Shoe Stores Co. v. National Shoes of N.Y. (1957) 213 Md. 328 [131 A.2d 909].) Such "source" identification does not, however, mean that the buyer must actually know the name of the source but only that the buyer directly associate the mark with but one, though, anonymous, source. (See California Apparel Creators v. Wieder of California (2d Cir.1947) 162 F.2d 893, 897-898; Rest., Torts (1938) § 715, com. b.) In a pragmatic sense, the concept of secondary meaning and probability of buyer confusion are directly interrelated in that confusion is likely to arise only where the buyer has come to recognize the mark as associated solely with the claimant source. As succinctly stated by then Presiding Justice Burke, "... secondary meaning is a shorthand phrase which describes the existence of conditions from which public confusion will flow if the defendant is permitted to pursue his deceptive scheme [citation]. If words have been used or employed ... in such a manner that the public has learned to associate them with the thing described, they acquire a *109 secondary meaning [citation].... If an association is thereby formed in the minds of the public which fixes plaintiffs as the source of something of a particular nature to be available in a particular place, this is sufficient because it follows that public deception may result if a distinguishing feature of the plaintiffs' program is adopted and used in an unfair and misleading manner by another." (Metro-Goldwyn-Mayer, Inc. v. Lee, supra, 212 Cal. App.2d 23, 30.)
(5) Contrary to Foremost's assertion, the combination of two or more generically descriptive words as a composite mark may result in a composite which is nondescriptive as a unitary term eligible for trademark protection. (Cf. Coca-Cola Co. v. Koke Co., supra, 254 U.S. 143; Firestone Tire & Rubber Co. v. Goodyear Tire & Rubber Co. (1975) 186 U.S.Pat.Q. 557 [affd. 189 U.S.Pat.Q. 348]; see 1 McCarthy, §§ 11:10, 12:12, pp. 364-365, 427.) The validity of a composite mark must be determined by viewing it in its entire and unfragmented context since "[t]he commercial impression of a trade-mark is derived from it as a whole, not from its [separated] elements...." (Beckwith v. Commr. of Patents (1920) 252 U.S. 538, 545-546 [64 L.Ed. 705, 708, 40 S.Ct. 414].) So long as the primary significance of the descriptive term in the minds of the buying public is shown to be the product source rather than the product, then trademark protection will be extended under the doctrine. (Cf. Kellogg Company v. Nat. Biscuit Co., supra, 305 U.S. 111, 118 [83 L.Ed. 73, 78]; see Ball v. American Trial Lawyers Assn., supra, 14 Cal. App.3d 289, 302; Cowles Magazines & Broadcasting, Inc. v. Elysium, Inc. (1967) 255 Cal. App.2d 731, 735 [63 Cal. Rptr. 507]; Metro-Goldwyn-Mayer, Inc. v. Lee, supra, 212 Cal. App.2d 23, 30; Industrial Photo Service v. Kelly (1961) 198 Cal. App.2d 665, 668 [17 Cal. Rptr. 907]; Family Record Plan, Inc. v. Mitchell (1959) 172 Cal. App.2d 235, 242 [342 P.2d 10].)
(6) Whether a descriptive term or mark has acquired a secondary meaning is ultimately a question of fact. (Educational Development Corp. v. Economy Co., supra, 562 F.2d 26, 29-30; Cowles Magazines & Broadcasting, Inc. v. Elysium, Inc., supra, 255 Cal. App.2d 731, 735; Visser v. Macres, supra, 214 Cal. App.2d 249, 254; Family Record Plan, Inc. v. Mitchell, supra, 172 Cal. App.2d 235, 243; Johnston v. 20th Century-Fox Film Corp. (1947) 82 Cal. App.2d 796, 813 [187 P.2d 474].) (7) As summarized by one leading authority: "Facts which are relevant in proving the existence of a secondary meaning include the duration and continuity of the use of the name [citations]; the extent of advertising and *110 promotion of the name and the sums spent therefor [citations]; sales figures showing the number of people who have purchased plaintiff's named product [citation]; and identification of plaintiff's and defendant's respective markets or marketing areas [citation]." (Cowles Magazines & Broadcasting, Inc. v. Elysium, Inc., supra, at p. 735.) Proof of secondary meaning is sufficient if it is shown that a substantial segment of the buying population associates the mark with a single source. (Metro-Goldwyn-Mayer, Inc. v. Lee, supra, 212 Cal. App.2d 23, 30.) (8) In a corollary context, liability for trademark infringement or unfair competition exists if an appreciable number, though not necessarily a majority, of reasonable buyers are likely to be confused by the similarity of the marks in question. (See John Walker & Sons, Ltd. v. Bethea (D.S.C. 1969) 305 F. Supp. 1302, 1306-1307; Coca-Cola Company v. Clay (C.C.P.A. 1963) 324 F.2d 198, 199; Schwartz v. Slenderella Systems of Calif. (1954) 43 Cal.2d 107, 112 [271 P.2d 857]; Ball v. American Trial Lawyers Assn., supra, 14 Cal. App.3d 289, 308.) Such buyers' association and probable confusion may be shown by a scientifically conducted opinion survey in the relevant market area.[7] (See King-Seeley Thermos Co. v. Aladdin Industries, Inc. (2d Cir.1963) 321 F.2d 577; 2 McCarthy, §§ 32:46, 32:48, pp. 498, 503.) (9) The Lampa survey of over 800 women shoppers in the San Francisco Bay, Sacramento and Fresno areas disclosed that: (1) of those who had seen or heard of "SA," nearly 45 percent recognized it as a brand name; (2) 46 percent were able to associate Knudsen by name with the identified brand demonstrating an unusually high level of brand-source association (a 70 percent association response was given by the numerical segment able to name any source). In the researcher's opinion, multiple use of the same brand in a single market area would eventually erode the distinctiveness of the mark as being associated with a single source. The admissibility and weight of such evidence were matters committed to the sound discretion of the trial court (Estate of Rowley (1967) 257 Cal. App.2d 324, 341 [65 Cal. Rptr. 139]; Witkin, Cal. Evidence (2d ed. 1966) §§ 406-413, pp. 365-374, passim; Evid. Code, §§ 720, subd. (a), 801); and in the absence of manifest abuse, its determination must be respected on appeal. (Conolley v. Bull (1968) 258 Cal. App.2d 183, 190 [65 Cal. Rptr. 689]; People v. Richardson (1968) 258 Cal. App.2d 23, 29 [65 Cal. Rptr. 487].)
Moreover, the contemporaneous consumer reaction highlighted by the increased sales of Knudsen products, coupled with the graphic similarity *111 between the stylized marks, provide further evidence from which an inference of buyer association and danger of confusion may be drawn. (Feathercombs, Inc. v. Solo Products Corporation (2d Cir.1962) 306 F.2d 251, 257-258 [cert. den., 371 U.S. 910 (9 L.Ed.2d 170, 83 S.Ct. 253)]; Industrial Photo Service v. Kelly, supra, 198 Cal. App.2d 665.) No plausible reason appears for Foremost's similarly featured, identical choice of words other than to capitalize on Knudsen's established trademark association. (See Industrial Photo Service v. Kelly, supra, at p. 668; Audio Fidelity, Inc. v. High Fidelity Recordings, Inc. (9th Cir.1960) 283 F.2d 551, 558.)
In view of such evidence, including the wide selection of competitive terms of phrases available to defendants,[8] no abuse is shown in enjoining the use of the mark adopted by plaintiffs in order to foreclose possible irreparable injury as weighed against defendants' potential damages. (Metro-Goldwyn-Mayer, Inc. v. Lee, supra, 212 Cal. App.2d 23, 32.)
Order granting preliminary injunction affirmed.
Elkington, J., and Newsom, J., concurred.
*112 
NOTES
[1] Carnation Company, one of the amici appearing herein, is a named party in a companion appeal, 1 Civil No. 44978.
[2] Since it appears that the trial court's determination of protectable trademark status was expressly based upon findings of secondary meaning, we limit our discussion to the merits of that claim and do not reach the separate issue whether the mark is alternately protectable as an inherently distinctive or fanciful term.
[3] Section 38521 provides: "Acidophilus milk is market milk, skim milk that is derived from market milk, or a combination of market milk and skim milk that is derived from market milk, which has been pasteurized and afterward fermented by a pure culture of a strain, or strains, of Lactobacillus acidophilus."
[4] The term "SA" is a literal contradiction since the fermenting bacterial agent, acidophilus, is itself tasteless. The generic and descriptive term, as used in milk products, is familiar to relatively few buyers (mainly health food enthusiasts) and generally connotes a sour-tasting milk. Thus, plaintiffs' mark describes a nonfermented, sweet-tasting product in literally contrasting terms.
[5] These principles have been codified in the relevant trademark registration statutes. (See 15 U.S.C. § 1051 et seq.; Bus. & Prof. Code, § 14200 et seq.) Though formal registration constitutes presumptive evidence of ownership of the mark (see, e.g., Bus. & Prof. code, § 14241; 3 Witkin, Summary of Cal. Law (8th ed. 1973) Personal Property, § 47, p. 1658), it is not a required condition to establish a protectable proprietary interest under common law rules. (See Educational Development Corp. v. Economy Co. (10th Cir.1977) 562 F.2d 26, 28-29; Cole of California v. Grayson Shops (1946) 72 Cal. App.2d 772, 777 [165 P.2d 963]; 74 Am.Jur.2d, Trademarks and Tradenames, §§ 75-76, pp. 748-749.) While, as correctly contended by Foremost, a long-standing administrative interpretation of a regulatory statute is entitled to great weight, such canon of construction is inapplicable where  as here  the interpretation made by the state and federal officials concerns a single, isolated registration application. (See generally 45 Cal.Jur.2d, Statutes, §§ 176-177, pp. 675-677.)
[6] Generally defined as: "relating to ... or descriptive of all members of a genus, species, class, or group." (Webster's Third New Internat. Dict., p. 945.)
[7] We agree with Foremost's contention that the relevant market area insofar as Knudsen's trademark claim is concerned would be limited to California. (See generally 74 Am.Jur.2d, Trademarks and Tradenames, § 17, pp. 714-715.)
[8] As plaintiffs perceptively suggest, a variety of descriptive terms were and are available to competitors: e.g., "acidophilus milk," "fresh acidophilus milk," "tasty acidophilus milk," "unfermented acidophilus milk," etc. Such use of the generic term as a common descriptive adjective is generally permissible. (See Firestone Tire & Rubber Co. v. Goodyear Tire & Rubber Co. (1976) 189 U.S.Pat.Q. 348, 350.)